IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE  DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNT LOVE'N CARING JUNIOR (TARGET NUMBER 61552468561609) THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. ___7:24mj136___ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher M. Cummings, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain accounts that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., an electronic communications service and/or remote computing service provider headquartered at 1 Meta Way, Menlo Park, California 94025.

2.       The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A) to require Meta Platforms, Inc., to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.      I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), currently assigned to Roanoke, Virginia, and have been so employed

1

since November 2003. Prior to being employed by HSI, I served the Department as a Border Patrol Agent from 2000 until 2003. In my current capacity as a Special Agent, I am responsible for investigating crimes relating to the sexual exploitation of children, including but not limited to crimes pertaining to the solicitation and enticement, as well as the importation, advertising, possession, access with intent to view, transportation, receipt, and distribution of child pornography in the Western District of Virginia. My training includes basic, advanced, and on-the-job training in this investigative area. I am familiar with procedures for obtaining and executing federal search warrants, and I have led and participated in the execution of numerous search and arrest warrants related to child exploitation and other sexual offenses, firearms and narcotics violations, money laundering, and fraud. I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program, the Immigration and Customs Enforcement (ICE) Special Agent Training program, and the Internet Crimes Against Children (ICAC) Task Force Basic On-Line Investigative Techniques Course. As a result of this training and experience, I am responsible for enforcing federal criminal statutes involving the sexual exploitation of children.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2422(b) (coercion and enticement of a minor to engage in sexual activity) have been committed by Lenny BALDWIN. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      On April 23, 2015, a grand jury in the Western District of Virginia charged BALDWIN (in case number 6:15-CR-7) with sexual exploitation of children, in violation of 18 U.S.C. § 2251(a); coercion and enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b); and transmitting interstate threats with the intent to extort, in violation of 18 U.S.C. § 875(d) Investigation of this case revealed that, beginning in summer 2013, when he was 19 years old, BALDWIN would initiate online communications through various social media accounts in different names, including through Facebook, with girls under the age of 18 and entice and coerce them into providing him with nude pictures and to have sex with him. For girls under 14, BALDWIN would tell the girls that they needed to keep their interactions "lowkey" because of their age difference.

8.      On October 24, 2016, BALDWIN pleaded guilty, pursuant to a Rule 11(c)(1)(C) plea agreement, to a one-count Information charging him with coercion and enticement, in violation of 18 U.S.C. § 2422(b), and the pending indictment was dismissed. As a part of the plea agreement, the parties agreed to a sentence of a term of imprisonment of 120 months, the mandatory minimum. On March 8, 2017, in accordance with the plea agreement, BALDWIN was sentenced to 120 months imprisonment and a lifetime term of supervised release.

9.      BALDWIN was released from custody on or about May 10, 2023, and began his term of supervised release.  His conditions of supervised release included the conditions that, without prior permission from his probation officer, he not have any contact with minors (other than incidental contact), including online; that he not utilize any social networking forums; and that he not obtain an internet-connected cell phone.

10.      On January 10, 2024, BALDWIN's probation officer filed a petition for an arrest warrant based on the allegation that BALDWIN had failed to updated his sex offender registration address.  Specifically, BALDWIN had been living at an unauthorized address and had failed to update his sex offender registration.  On May 14, 2024, The Honorable Judge Norman K. Moon revoked BALDWIN's supervised release and sentenced BALDWIN to a term of 8 months as a result of his supervised release violation.

11.      In April 2024, I learned that Lenny BALDWIN was reported to have engaged in the enticement of a minor and to have failed to report his correct address as a sex offender, which was a condition of his supervised release.  This tip was reported by a parent of a minor to another law enforcement agency on or about July 24, 2023, mere months after BALDWIN was released from custody.  The reporting party (RP) stated BALDWIN had approached his/her son on numerous occasions at American Eagle located at Valley View Mall in Roanoke, Virginia.  The RP stated BALDWIN approached his/her son on several occasions to "hang out."  The RP further stated he acted "very strange" towards his/her son as well as other minors at the mall and that he/she felt BALDWIN was trying to "groom" them.

12.      In July 2024, I spoke on the telephone with the child of the RP regarding his interactions with BALDWIN.  The child, who is now 18 years old, stated he worked four days a week at American Eagle clothing store at Valley View Mall from April 2023 until February 2024.

He stated BALDWIN acted inappropriately toward him on several occasions. He stated BALDWIN would come in the store regularly when he was working and say sexually inappropriate things. BALDWIN would buy something at the store so he could talk to the minor while he worked behind the register. The minor remembered BALDWIN filling out a credit card application while he worked behind the counter. The minor thought BALDWIN was only filling out the application so he could speak to the minor. He stated BALDWIN invited him to his hotel room on multiple occasions and stated that other minors would be there. BALDWIN asked for his phone number on several occasions. The minor did not provide his phone number to BALDWIN or communicate with him on social media. He said BALDWIN came in the store several times and would talk about how he was counting down until the minor's eighteenth birthday. He would say things like: "four more months until your birthday." The minor believed BALDWIN to be implying that he had to wait until he was no longer a minor and could then have sexual relations with him. The minor said he gave BALDWIN no reason to think that he had any interest in any form of relationship with BALDWIN. He reported BALDWIN's unwelcome behavior to the store manager, his parents, and to mall security.

13.    I also learned that on January 3, 2024, the Roanoke City Police Department (RCPD) received a call regarding the enticement of a minor. An anonymous caller reported that a 16-year-old minor (identified as MV1) was brought to Carilion Roanoke by police due to him making suicidal comments to his mother. The caller reported that MV1 disclosed while being evaluated that his mother allowed a registered sex offender (BALDWIN)[1] to live in their basement for a few

---

[1] It is unclear whether MV1 specifically identified BALDWIN by name or whether the caller later was able to identify the person MV1 described as being BALDWIN.

weeks until December 16, 2023.[2]  The caller stated BALDWIN had just gotten out of jail after serving 8 years.  They stated he eventually made friends with the mother and moved in because he had nowhere to go.  The caller stated that there were suggestive text messages from BALDWIN to MV1 on MV1's phone.  The caller said MV1 took screenshots of the text messages.  The caller stated the text messages contained statements like, "I don't know if you can take these 10 inches," and "can you handle it."  According to the caller, BALDWIN told MV1 to delete the messages so no one would see them.  MV1's mother also told the caller that BALDWIN had touched the child's leg.  During this encounter with MV1, RCPD consensually retrieved data from MV1's cell phone.  This data included approximately 40 screenshots of text messages between MV1 and BALDWIN that MV1 had taken in October 2023 and December 2023.  BALDWIN's messages were sent using two different phone numbers, (540) 817-0203 and (540) 308-9597.

14.     I have reviewed the screenshots of text messages exchanged between BALDWIN and MV1.  The October 2023 screenshots include the following messages sent by BALDWIN (on the left side) using (540) 817-0203 and by MV1 (on the right side in blue):



---

[2] This was the unauthorized address that was the basis for BALDWIN's supervised release violation.













15.     Notably, in the second and fourth screenshots, BALDWIN "unsends" some of his salacious messages, which would effectively delete them from MV1's phone had MV1 not already screenshotted them.

16.     The December 2023 screenshots include the following messages sent by BALDWIN (on the left side) using (540) 817-0203 and by MV1 (on the right side in blue):







17.    Notably, in the second and third screenshots, BALDWIN "unsends" several messages, some of which were not recovered from MV1's phone.

18.     The December 2023 screenshots also include the following messages sent by BALDWIN (on the left side) using (540) 308-9597, and by MV1 (on the right side in green):







19.    On or about January 10, 2024, a RCPD detective interviewed BALDWIN about his interactions with MV1. BALDWIN denied sending anything inappropriate to MV1. BALDWIN also provided two different phone numbers at which he said he could be reached, although neither phone number was one of the phone numbers that BALDWIN used to text MV1.

20.    In August 2024, I spoke with MV1 regarding BALDWIN. He told me they met when they worked together at Dollar Tree in late summer of 2023 in Roanoke, Virginia. BALDWIN had several different phones and phone numbers while they were around each other. BALDWIN said he needed to keep switching phone numbers because "his PO was after him." Another detective and I showed MV1 approximately 20 different screenshots of text messages between MV1 and BALDWIN, including the messages shown above. MV1 acknowledged that each of the text messages were between him and BALDWIN. MV1 specified where he understood BALDWIN to be asking if MV1 would date BALDWIN. MV1 told me that he had no interest in

BALDWIN in that way.  MV1 pointed out where BALDWIN had unsent certain messages because BALDWIN knew he could get in trouble for attempting to entice MV1 in a sexual way.  MV1 recalled another text message where BALDWIN told MV1 that "he had a cute smile."  This message was captured by MV1 in a December 2023 screenshot:



21.    MV1 recalled that BALDWIN texted him that message while he and BALDWIN and MV1's mother were sitting on the front porch together.  MV1 recalls laughing about something and then immediately receiving a text from BALDWIN.

22.    MV1 also recalled sexual statements BALDWIN had verbally made toward him to include "I've had eyes on you since I met you," "when is it going to be me and you?," "you'll understand when you're older," "can you take all 10 inches?," and "are you going to try it with me."  MV1 felt that BALDWIN would laugh at anything MV1 said and took it to be BALDWIN acting in a flirtatious manner towards him.  Sometimes BALDWIN would laugh and touch MV1's arm.  He told MV1 that he liked him and he wanted to date him.  MV1 made it clear that MV1 was "100%" straight" and did not want to date BALDWIN.  MV1 explained and pointed out in several text messages that BALDWIN asked MV1 to keep their communications a secret and delete any text messages that BALDWIN sent MV1 that were sexual in nature.  MV1 further explained how

BALDWIN wanted access to monitor MV1's blood sugar level (MV1 is diabetic). MV1 felt that BALDWIN was trying to obtain some type of control over him and felt it was strange.

23.    MV1 recalled that BALDWIN showed him adult pornography on at least four or five occasions. BALDWIN would call him over and then surprise him by showing it to him. BALDWIN also told MV1 that he was going to show the pornography to MV1's younger brother. BALDWIN asked for MV1's Snapchat almost every week. This is why MV1 only texted with BALDWIN. He did not want BALDWIN contacting him on any of his social media accounts. He said BALDWIN would try almost every other week to get his social media profiles.

24.    MV1 also recalled when BALDWIN attempted to kiss him while MV1 was sitting in a vehicle. BALDWIN leaned in through the car window outside of Dollar Tree, and MV1 pushed him away. MV1 also recalled a time when they were sitting in the car together, and BALDWIN put his hand on MV1's thigh, and MV1 "smacked" BALDWIN's hand away. MV1 said that BALDWIN said, "I see how it is" and got out of the car.

25.    MV1 stated that he remembered BALDWIN using at least two different cell phones, to include a Samsung A13 and an iPhone 13. MV1 said someone got the Samsung for BALDWIN and that MV1's mom allowed BALDWIN to use MV1's deceased dad's iPhone 13. BALDWIN was not permitted to use these smartphones without permission from his probation officer. However, I have spoken with his probation officer, and BALDWIN did not have approval to use these devices.

26.    I also interviewed MV1's younger brother (who is currently in 11th grade), identified as MV2. MV2 said BALDWIN made some sexual advances toward him but made more sexual advances toward MV1. MV2 recalled BALDWIN asking MV2 if "he could take it." At one point BALDWIN texted MV2 at 2:00 or 3:00 am and asked for a picture of MV2's "ass."

BALDWIN later asked MV2 to delete the text. MV2 responded by stating "no, that is borderline child pornography."

27. On August 23, 2024, a summons was issued to Meta, Inc., related to any accounts associated with phone numbers (540) 817-0203 and 540-308-9597 These phone numbers were identified as the numbers used to text with MV1 on the captured screenshots. On August 26 , 2024, Meta Inc. provided HSI with the following, among other information: Phone number (540) 817-0203 was verified by the owner and used to create Facebook account and vanity name Love'n Caring Junior. This account was created on or about October 15, 2023, and had log-in activity until on or about January 3, 2024, one week before BALDWIN was arrested on state failure-to-register charges. BALDWIN's probation officer did not give BALDWIN permission to create a Facebook account.

## BACKGROUND CONCERNING FACEBOOK[3]

28. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

29. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and

---

[3] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

30.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

31.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

32.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their

Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

33.    Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

34.    Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

35.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

37.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes

stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

40.    In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

41.    Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

42.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

43.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the

provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

44.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or

consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45.      Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

46.      I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

47.      In May 2023, BALDWIN was released from federal prison after serving a sentence for coercing and enticing a minor in the Western District of Virginia.  Within a few months of his release, BALDWIN began engaging in inappropriate and sexually explicit advances of minors in Roanoke, Virginia.  There is probable cause to believe that BALDWIN sent sexual text messages and made physical advances amounting to the coercion and enticement of a minor.  BALDWIN additionally sought to obtain MV1's Snapchat for the purpose of engaging in additional coercive and enticing behavior.  And there is probable cause to believe that BALDWIN registered a Facebook account in October 2023 using the same number that he was texting MV1 in October 2023 despite being prohibited from doing so by his conditions of supervised release.  I believe

there is probable cause that BALDWIN's social media accounts will contain evidence of the coercion and enticement of minors to engage in sexual activity.

48.    Based on the foregoing, I request that the Court issue the proposed search warrant.

49.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Meta. Because the warrant will be served on Meta, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

CHRISTOPHER M
CUMMINGS
Digitally signed by
CHRISTOPHER M CUMMINGS
Date: 2024.09.09 08:10:41 -04'00'

Christopher M. Cummings
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on ___September 9___, 2024

_____
Honorable C. Kailani Memmer
UNITED STATES MAGISTRATE JUDGE

21